UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHONA ALLISON, et al.,<br>    Plaintiffs,<br><br>    v.<br><br>CRC INSURANCE SERVICES, INC.,<br>    Defendant/ Counter-Plaintiff<br><br>    v.<br><br>MATT ANDERSON, et al.,<br>    Counterclaim Defendants. | No. 10 C 3313<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

CRC Insurance Services, Inc. ("CRC") comes now with a motion for a preliminary injunction. Specifically, CRC seeks to enforce certain employment agreements as to former employees who have left CRC and are now employed by a competitor. While there are unknown facts regarding this dispute, there are few undisputed facts. What is presented here is a legal challenge to employment agreements. For the following reasons, I deny CRC's motion for a preliminary injunction.

## I. STATEMENT OF FACTS

CRC is a commercial lines wholesale broker founded in 1982. As of May 3, 2010 CRC had over 800 employees in its wholesale brokerage operations and was one of the leading wholesale insurance brokers in the country. This motion arises out of the resignation of over 120 CRC employees who began working for a competitor.

While the motivation behind certain actions is contested, it is undisputed that Tim Turner ("Turner"), the former co-President of CRC, resigned from CRC on or about January 22, 2010

and joined CRC competitor Ryan Specialty Group ("RSG") as the Managing Director. Ed McCormack ("McCormack"), whose role as outside counsel is disputed, joined RSG on February 5, 2010. McCormack is a lawyer who had worked on employment agreement and restrictive covenant matters for CRC. On February 9, 2010 Patrick Ryan ("Ryan") and RSG announced that they would enter the wholesale insurance business with Turner. R-T Specialty ("RTS") was founded by Ryan and Turner on March 2, 2010. CRC alleges that McCormack solicited CRC employees to join the newly formed RTS.

It is undisputed that on or about May 4, 2010, over 120 CRC employees left CRC's wholesale insurance brokerage business and joined RTS and RSG. All Plaintiffs are former members of CRC's Chicago office. Included in Plaintiffs' Employment agreements are post-termination covenants. At issue in this lawsuit is the enforceability of the non-compete agreement, the confidentiality agreement, and the non-solicitation agreement.

Both parties agree that CRC's confidentiality agreement is enforceable, and Plaintiffs have represented to the Court that they are actively working to ensure that no former CRC employee breaches this agreement. To that effect, RTS's counsel prepared a "Dos and Don'ts" list that accompanied each prospective employee's offer letter. This list explicitly encouraged compliance with all confidentiality agreements. The two remaining employment agreements are disputed. CRC's non-compete agreement prohibits CRC employees from being "employed or associated with . . . any person, firm or corporation" that may be in competition with CRC Illinois for a period of two years from the date the employee ends his employment with CRC. CRC's non-solicitation agreement generally prohibits former CRC employees from soliciting or selling services or products to any present or prospective client of CRC with whom the former

employee had personally performed services for or whom the employee had solicited during the past twelve months of the employee's employment at CRC. Former CRC employees are also prohibited from encouraging CRC employees from leaving their employement.

On January 25, 2010, Turner and RSG filed a lawsuit in California seeking a declaration that various restrictive covenants in the CRC employment agreement were unenforceable. Subsequently on April 20, 2010, upon learning that its employees were allegedly being solicited to leave its employment, CRC filed suit in Alabama state court. On May 4, 2010, former CRC employees, the individual Plaintiffs, and RTS filed a Complaint against CRC in the Circuit Court of Cook County, Chancery Division, alleging that notwithstanding certain restrictive covenants, RTS wished to hire CRC's employees to work for RTS and service those clients who "choose to" obtain wholesale brokerage insurance services from RTS.

On May 5, 2010, CRC amended its complaint in Alabama and sought a TRO and expedited discovery. On May 10, 2010, the Alabama court issued an Order ("Stand Still Order") providing expedited discovery and prohibiting McCormack, RTS, RSG and Ryan from causing the former CRC employees "to engage or participate in any business that is in competition in any manner whatsoever with the business of CRC" and "to solicit or accept any business from any customers with whom she/he worked with CRC." On Friday, May 28, 2010, the Stand Still Order expired as to RTS, RSG and Ryan because the Judge found that the Alabama court did not have jurisdiction over those parties. The case remains as to McCormack. CRC now comes before this Court seeking a preliminary injunction. On June 1, 2010, Defendant CRC removed the state court lawsuit filed in Cook County to federal court, answered the complaint and counterclaimed adding additional Counterclaim Defendants and other employees who had left

3

CRC. On June 8, 2010, Plaintiffs sought leave to file an amended complaint in federal court. Leave was granted and the amended complaint has been filed.

On June 11, 2010, a preliminary injunction hearing was held.

## II. STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden on persuasion." *Boucher v. School Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). A court may grant temporary or preliminary injunctive relief to a party who (1) has some likelihood of success on the merits; (2) has no adequate remedy at law; and (3) will suffer irreparable harm if an injunction does not issue. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003). If CRC meets this burden, then I must weigh the injury CRC will suffer if the injunction is denied against any harm Plaintiffs may suffer if the injunction is granted. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.,* 549 F.3d 1079, 1096 (7th Cir. 2008). In balancing the harms to each party, I will also consider any potential harm to the public interest. *Id*. at 1086; *Goodman v. Illinois Dept. of Financial and Professional Regulation,* 430 F.3d 432, 437 (7th Cir. 2005).

## III. DISCUSSION

**A. CRC Has Shown Likelihood of Success on the Merits.**

The demonstration of a likelihood of success is a threshold question and a low standard requiring only a "'better than negligible' chance of success on the merits." *Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1096 (internal citation omitted). I find that CRC has met this standard.

4

1. CRC's Breach of Contract Claims

CRC contends that each former CRC employee who has joined RTS is in violation of their Employment Agreement's prohibition against being "employed by or associated with" a competitor to CRC in Illinois, soliciting or accepting business from CRC customers, and misappropriating confidential information. Certain obligations are not in dispute. For example, in regard to the confidentiality agreement, both parties agree that its provisions are enforceable and Plaintiffs have represented to the Court their intention to enforce the confidentiality provisions to the best of their ability. Additionally, the parties agree that Plaintiffs are barred from soliciting current CRC employees or CRC clients. The parties disagree as to the enforceability of the non-compete agreement and the scope of the non-solicitation agreements.

Plaintiffs argue that CRC cannot show possible success on the merits stating that the non-compete agreement is unenforceable because it contains a prohibition against former CRC employees working in their chosen profession of the wholesale insurance brokerage business. In support of this argument, Plaintiffs cite to cases in this Court as well as Alabama and Illinois state courts. *Nobel Biocare USA, Inc. v. Lynch*, No. 99 C 5774, 1999 WL 958501, at *1 (N.D. Ill. Sept. 15, 1999); *Calhoun v. Brendle, Inc.*, 502 So. 2d 689, 693-94 (Ala. 1986); *Lawrence & Allen, Inc. v. Cambridge Human Res. Group, Inc.*, 685 N.E.2d 434, 437 (Ill. App. Ct. 1997). In these cases, courts have held that agreements foreclosing an employee's right to work in his chosen profession are unenforceable.

CRC distinguishes these cases arguing that unlike here, the cases cited by Plaintiffs involve employees who were prevented from engaging in any aspect of their chosen profession, in some cases, on a global scale. *Nobel Biocare USA, Inc. v. Lynch*, No. 99 C 5774, 1999 WL

5

958501, at *1 (N.D. Ill. Sept. 15, 1999) (agreement prohibited employee from working for a direct or indirect competitor anywhere in the United States); *Calhoun v. Brendle, Inc.*, 502 So. 2d 689, 693-94 (Ala. 1986) (agreement prevented employee from competing in fire equipment industry which was a particular hardship because it was the only business in which he was trained or had experience); *Lawrence & Allen, Inc. v. Cambridge Human Res. Group, Inc.*, 685 N.E.2d 434, 437 (Ill. App. Ct. 1997) (agreement prevented competition encompassing the United States). Here, CRC argues that their former employees are free to work anywhere in the insurance business aside from wholesale brokerage within Illinois. Accordingly, CRC contends that its former employees will not be foreclosed from engaging in their chosen profession. Furthermore, CRC states that its former employees, through their CRC salaries, were compensated for any restrictions now imposed by this agreement. It is undisputed that the former CRC plaintiffs signed the non-compete agreements.

As to CRC's non-solicitation agreement, Plaintiffs argue that it is unenforceable because CRC has no protectable interest in its customers and because enforcing this provision would impose an undue burden on third parties. Restrictive covenants will be enforced when they are reasonably calculated to protect an employer's legitimate business interest. *Outsource Int'l, Inc. v. Barton,* 192 F.3d 662, 666 (7th Cir.1999). Illinois law recognizes a protectable interest where the customer relationship is "near-permanent" and "but for the employee's association with the employer the employee would not have had contact with the customers." *Id*. However, "where evidence indicates the clients utilize several providers of the same type of professional services simultaneously, the near-permanency test will not be satisfied." *Springfield Rare Coin Galleries, Inc. v. Mileham*, 620 N.E. 2d 479, 489 (Ill. App. Ct. 1993).

Plaintiffs contend that the "revolving-door" nature of the wholesale insurance business does not foster customer relationships that are "near-permanent" or "sufficiently unique." Furthermore, Plaintiffs argue that the important relationship is not between the customer and the retail brokerage firm, but the personal relationship between the individual wholesale brokers and the retail brokers. Plaintiffs assert that such a relationship does not belong to the employer, but instead to the individual brokers. As to the impact on third parties, Plaintiffs rely on *National Specialty Underwriters, Inc v. Anderson & CRC Insurance Services*, where Judge Shadur declined to award injunctive relief because it would deprive a client of its ability to choose a service provider. No. 08 C 2360 (N.D. Il. June 24, 2008) (hearing denying preliminary injunction in open Court). The rationale behind this, and other similar decisions, was that individuals should be free to voluntarily shift providers.

CRC argues that the protectable interest in its customer relationships "cannot be questioned." Specifically, CRC points to the money, personnel hours, and other resources that have been dedicated to securing and enhancing relationships with its clients. Without these resources, CRC argues, the relationships that Plaintiffs describe would not be possible. Furthermore, CRC argues that the Shadur decision is inapposite because it is overly restrictive and does not deal with the situation where 120 employees are at stake.

After considering the arguments made by each party, I find that CRC has met the minimal standard of showing a "'better than negligible' chance of success on the merits" as to its breach of contract claims. *Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1096 (internal citation omitted). Specifically, for purposes of this motion CRC has sufficiently shown that its former

7

employees would not be foreclosed from working in their chosen field and has shown that it has a protectable interest in the broker-client relationship.

2. Declaratory Judgment Claims

CRC argues that the restrictive covenants in the employment agreements are enforceable and that it is entitled to a preliminary injunction barring Ryan, RSG and RTS from (1) soliciting, hiring or employing any CRC broker who is not based in California for a period of 2 years after the employee leaves CRC; and (2) soliciting or servicing clients and prospective clients of any CRC Employee for a period of 2 years after the employee leaves CRC. To show its likelihood of success on the merits, CRC notes that over 120 employees have left CRC stating their intention to join RTS. Plaintiffs do not dispute that employees have left CRC, but argue that there is no provision preventing an employee from leaving CRC of its own free will. Considering the employment agreements signed by the Plaintiffs and CRC's undisputed loss of employees, I find that CRC has met its burden on showing a likelihood of success on its merits.

3. Tortious Interference with a Contract Claim

CRC argues that it is entitled to injunctive relief prohibiting Ryan, RTS and RSG from employing former CRC employees, other CRC brokers not based in California, and from soliciting and accepting business from clients of the CRC employees. CRC is entitled to preliminary relief under Illinois law if it can show that it has a better than negligible chance of demonstrating: (1) the existence of a valid, enforceable contract between the CRC and a third party; (2) Ryan's, RTS's and RSG's knowledge of that contract; (3) Ryan's, RTS's and RSG's intentional and unjustified inducement of the third party to breach the contract; (4) a subsequent breach by the third party resulting from Ryan's, RTS's and RSG's wrongful conduct; and (5)

damages suffered by CRC as a result of the breach. *Voutiritsas v. Intercounty Title Co. of Il*, 664 N.E.2d 170, 187 (Ill. App. Ct. 1996). The fact that CRC employees left CRC and moved to RTS is undisputed. While Plaintiffs argue that CRC cannot succeed on its tortious interference claims because no contract provision prevented the employees from simply leaving CRC to work for RTS, I find that CRC has successfully demonstrated a likelihood of success as to this claim given the employee contracts, Ryan, RTS and RSG's knowledge of those contracts, the large scale departure of CRC employees and the damages CRC has suffered as a result of the departure of numerous employees who moved to RTS.

### 4. Conspiracy Claims

CRC argues that it has a substantial likelihood of succeeding on the merits of its conspiracy claim. To establish a conspiracy, CRC must establish: (1) an agreement between two or more persons; (2) the agreement is to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an overt act performed by one of the parties in furtherance of the common scheme; and (4) injury caused by the overt act. *Canel and Hale, Ltd. v. Tobin*, 710 N.E.2d 861, 873 (Ill. App. Ct. 1999). CRC argues that Ryan, Turner and McCormack unlawfully agreed to take employees and clients from CRC. Given the relationship of Ryan, Turner and McCormack, and the departure of 120 employees from CRC, I find that CRC has met its burden on showing a likelihood of success on its merits.

**B. CRC Has Shown No Adequate Remedy at Law.**

CRC next must establish that it has no adequate remedy at law. *Foodcomm,* 328 F.3d at 304. To establish that CRC has no adequate remedy at law, it need not show that a remedy at law would be "wholly ineffectual; rather, the remedy must be seriously deficient as compared to the

9

harm suffered." *Id*. The Seventh Circuit has held it "virtually impossible to ascertain the precise economic consequences of intangible harms, such as damages to reputation and loss of goodwill." *Brown & Brown, Inc. v. Ali*, 494 F.Supp.2d 943, 955 (N.D. Ill. 2007) (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902 (7th Cir. 2001).

CRC contends that it has suffered numerous intangible harms damage to the morale of its employees, loss of goodwill, and disruption to the normal course of business. It has also lost clients, employees, and confidential and proprietary information. The result of these losses has caused "incalculable harm to its business interests and reputation [such] that CRC may not be able to survive."

Plaintiffs argue that CRC does have an adequate remedy at law -- money damages. Further, Plaintiffs deny that CRC has lost any goodwill due to the turnover in the wholesale business. To the extent that goodwill does exist, Plaintiffs assert that it lies with the individual employees, rather than the brokerage firm. Next, Plaintiffs argue that even if CRC is able to show goodwill, relief lies in damages, not injunctive relief. *See IKON Office Solutions, Inc. v. Belanger*, 59 F.Supp.2d 125, 132 (D. Mass. 1999) (denied injunctive relief because "the loss of customer goodwill is not necessarily irreparable.") Plaintiffs highlight the quantifiable loss of business in terms of lost sales and the premium volume accounted for by the lost employees. Accordingly, Plaintiffs argue that CRC's damages can be quantified and their relief lies in damages. *Ivy Mar Co. v. C.R Seasons Ltd.*, 907 F. Supp. 547, 566 (E.D.N.Y. 1995)("Loss of business, if it is not remote or speculative but actual, is quantifiable injury.")

While it is true that certain (even most of the) damages to CRC are quanitifiable, I find that they not so quantifiable with respect to all the harm suffered. It would be virtually impossible to quantify the damage to goodwill, loss of reputation, and impact on the remaining

10

CRC employees that has resulted from the loss of the over 120 CRC employees and the alleged breaches of contracts. Accordingly, I find that CRC has met its burden of establishing that it has no adequate remedy at law when compared with the harm it is suffering.

**C. CRC Has Shown Irreparable Harm.**

The next threshold question is whether CRC has shown that absent the issuance of an injunction, it would suffer irreparable harm. *Foodcomm*, 328 F.3d at 303.

CRC argues that without the issuance of an injunction it will be irreparably harmed by its lost ability to maintain relationships with its customers, the continued loss of current and prospective clients, the loss of information to a direct competitor and a loss of its competitive edge. CRC also argues that without an injunction it would continue to lose employees as the actions of former CRC employees may encourage other CRC employees to violate their Employment Agreements or other CRC competitors to interfere with CRC's contracts with its remaining employees.

As to irreparable damage, I note two instances. First, there is irreparable damage that is already done. For example, reputational damage, loss of goodwill and loss of CRC employees. Other damage is ongoing. This damage is incurred by the loss of personnel to handle the ordinary course of business and the additional scrambling that was necessary to respond to the employee loss. Not only does ordinary business not continue, but there is the additional upset and uproar that accompanies such a large loss of employees. While I note that the loss of a significant number of employees is not unheard of within the industry, and there is likely a path to repair the damage, this fact does not mitigate the past and ongoing damage to CRC.

The irreparable damage I consider is the stress and continuing cost of resuming normal business. I find that CRC has successfully shown irreparable harm and accordingly turn now to a balance of harms analysis.

**D. The Balance of Harms Weighs in Favor of Denying an Injunction.**

Having found that CRC has met the initial threshold for issuing a preliminary injunction, I must now balance the potential harm to Plaintiffs that would result from the issuance of the injunction with the harm to CRC if its motion for a preliminary injunction is denied. *Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1096.

As an initial matter I recognize that this ruling will not eliminate the uncertainty as to the enforceability of the disputed non-competes which may be a source of harm to both sides. If an injunction is denied, other employees could doubt the enforceability of their own agreements leading to further chaos. CRC adds that such uncertainty could result in 'pirating' not only of CRC employees, but throughout the industry (which, of course, is not before me as a class). If after the denial of a preliminary injunction it is shown (after a full evidentiary hearing) that an injunction should be issued, then each of the individual Plaintiffs would be forced to cease working for RTS. Those employees would have then foregone retooling their skill set, looking for new work, and will likely not have CRC's offered amnesty to returning employees left to consider. Likewise, the granting of an injunction would not foreclose a finding that the employment agreements are unenforceable at the conclusion of this litigation. When I address balancing the harms, one question is always whether the injunction will in fact alleviate the alleged harm.

### 1. Injury to Plaintiffs if Injunction is Granted

CRC argues that absent an injunction, the sole harm to the former CRC employees would be their restriction from: (1) associating with companies in competition with CRC in Illinois, and (2) soliciting CRC's customers with whom they had material contact with, for a period of two years. CRC argues that this would not result in a substantial harm to the individual plaintiffs because of the large sums of money they received in compensation over the years. Essentially, CRC contends that these former employees were "pre-paid" for the post-termination covenants. Moreover, CRC argues that its former employees would not be without employment opportunities. CRC submits that these individuals could work outside of the wholesale insurance business, solicit new clients who have no history with CRC, or work for wholesale insurance brokerage companies outside of Illinois. CRC notes that only 39 of the former employees had non-compete agreements.[1] In addition, CRC has offered its former employees the opportunity (called amnesty) to return to CRC at compensation levels for 2010 and 2011 at 2009 W-2 levels.

Furthermore, CRC argues that RTS and RSG, "face[] little to no harm as a result of not being able to profit from the taking of CRC's business" if an injunction is issued because it is a newly formed entity. CRC states that as such a new entity it has "little to unwind" as it has few obligations that cannot be stopped if an injunction were to issue. Moreover, CRC denies that any customer would be harmed as an innocent third party if an injunction were to be issued. While the testimony of Stephen Ware (a retail client) indicated that his broker was uniquely suited to

---

[1] CRC points to the declaration of CRC Chief Operating Officer Charles W. Wood ("Wood"). In his declaration, Wood states that former broker Alison Oliphant left CRC in 2008 and went on to work as an underwriter for two years and that former CRC broker Adrian Smith worked in Wisconsin during his two-year non-compete period to ensure compliance. These statements, however, are hearsay. I therefore do not consider this declaration for purposes of this motion.

13

serve his needs, CRC argues that another broker of comparable expertise could "easily pick up that knowledge base so that Ware continued to be wholly serviced." CRC states that a retail agent would not incur hardship because retail agents frequently use multiple wholesale brokers and have multiple established relationships.

Plaintiffs argue that the damage to RTS and the individual Plaintiffs would be "great and unquantifiable" if an injunction were imposed. RTS would never know the loss of potential business if it was forced to decline all inquiries by former CRC clients. Both parties admit that if an injunction were issued, RTS would not survive. Furthermore, the injunction would bar the former employees from their livelihood, servicing clients as wholesale insurance brokers. Imposing an injunction, Plaintiffs argue, is "tantamount to saying that the Employee cannot work in the wholesale brokerage business at all." The evidence has shown that wholesale brokerage is a specialized area of expertise. Additionally, it is clear that large and successful brokerage firms are nationwide and generally service a nationwide client base.

## 2. Harm to CRC if Injunction is Denied

As noted *supra*, CRC argues that without an injunction, it will experience irreparable injury. It would lose customers, additional employees, reputation and goodwill. Furthermore, the remaining employees at CRC would be left in a disruptive and uncertain state including scrambling to maintain day to day business and diminished morale. Moreover, CRC argues that it should not be punished for RTS's misconduct with CRC's employees. Turner and Ryan allegedly conspired to steal over 120 CRC employees and CRC argues that Turner and Ryan should not be rewarded for their bad behavior. CRC also contends that if an injunction is issued and the former CRC employers are fired as a result, they would have recourse against RTS if

14

"RTS deceived them during the solicitation and hire" as to the enforceability of their employment agreements.

Plaintiffs argue that if the injunction is denied CRC would experience no substantial burden. CRC maintains complete records of its business and clients and therefore can be compensated with damages if they succeed in this action. Accordingly, Plaintiffs argue that CRC can freely pursue its clients' business and further calculate and quantify any damages.

### 3. Reduction of Harm if Preliminary Injunction is Granted

At the preliminary injunction hearing I asked what, if any, reduction of harm would occur if the injunction is issued. CRC submits that its harm would be reduced by an injunction, and generally states that there would be a reduction of much irreparable harm by: (1) reducing the loss of CRC business resulting from fears of CRC stability; (2) decreasing the strain on the remaining CRC employees as to the viability of the company and the security of their jobs; (3) alleviating the pressure on CRC offices which "remain under attack by RTS' bombardment of solicitation"; (4) repairing the damage to reputation and goodwill; (5) empowering former CRC employees who were mislead by RTS about the validity of their contracts and allowing them to return to CRC with full amnesty; (6) alleviating stress on the marketplace caused by RTS forcing CRC clients to "get settled somewhere"; (7) decrease uncertainty regarding the enforceability of CRC's employment agreements; and (8) easing the violation of public trust and public policy caused by the conduct of McCormack who, CRC alleges, used confidential information to actively solicit CRC employees.

Plaintiffs argued that the issuance of an injunction would reduce little, if any, of CRC's alleged harms. Specifically, Plaintiffs argue that many of the harms that CRC complain of, for example reputational damage, loss of goodwill and uncertainty within CRC, flow from the loss

of the employees. This harm, however, has already occurred and the issuance of an injunction will not repair such damage.

### 4. The Balance of Harms

As noted *supra*, the irreparable harm that I am concerned with stems from the stress, disruption, and continuing cost of resuming normal business at CRC. While it is true that the issuance of an injunction would prevent the former employees from competing with CRC and prevent the employees from soliciting and servicing its clients, CRC has failed to show how this would reduce its alleged harms. The record has shown that the former employees do not intend to return to CRC. Accordingly, CRC will still suffer harms stemming from the employees' departure. As to the loss of client business, these are quantifiable damages. Furthermore, nothing in the record has shown that following the issuance of an injunction any client would return to CRC to continue business with an alternate broker.

It is undisputed that this decision will negatively impact the business of either CRC or RTS. Both Plaintiffs and CRC acknowledge that enforcing either the non-compete or the non-solicitation covenant would have a similar effect – to shut down RTS. Likewise, Plaintiffs and CRC admit that without an injunction enforcing the non-compete agreement, CRC will lose business. However, while there is no doubt that CRC would incur a loss to business, the evidence has not shown that it will be put out of business by a failure to enjoin. While CRC's Chicago office was no doubt very successful, evidence has not shown that CRC will be unable to survive the losses it has incurred.

Regarding the non-compete agreement, the immediate impact will be on the former CRC employees. While CRC argues that its former employees could sell wholesale insurance in another geographic area, Plaintiffs note, and I agree, that this business is nationwide. It is

16

certainly possible that the brokers in question could find new work in a related field, however, this would not come without difficulty. Furthermore, it remains unclear whether any broker would be able to successfully practice his given profession if the injunction was put into place. Accordingly, the immediate effect of an injunction would essentially render these employees jobless, if not for the full two years, at least for the duration of this litigation.

Turning now to the current CRC employees, it is clear that they have experienced significant harm. These employees have seen their colleagues leave CRC and are currently dealing with the aftermath. While an injunction could improve their morale, it will not bring their colleagues back. The remaining employees will still be forced to deal with the daily disruption of missing staff and the uncertainty regarding the ongoing litigation. No evidence has been put forth to show that any plaintiff will return to CRC. While CRC is correct that an injunction will temporarily uphold the enforcement of the employment agreements, it is clear that the enforcability of these provisions has been called into question. A preliminary injunction is not a judgment on the merits and will not alleviate this uncertainty.

To the extent that the enforceability of the non-solicitation agreement as to CRC employees and confidentiality agreements are in question, CRC argues that without an injunction Plaintiffs would be free to solicit its remaining employees and use confidential information. Both of these actions are prohibited by the covenant in question, and Plaintiffs acknowledged in open court that this covenant is enforceable. Plaintiffs have further stated that they have no intention of violating either provision, and I therefore do not weigh this in rendering my decision.[2]

---

[2] CRC argues that confidential information is missing and has been used. It points to the continued return of materials and the alleged use of CRC client contact information. I do not

Regarding the public interest, which I also consider, I find that there is a tie. CRC argues that its former employees were aware of the non-compete covenant when they began working for CRC. This agreement was voluntarily signed, and no testimony was put forth to indicate that any Plaintiff was unaware of the agreement when he or she began working for CRC. CRC also argues that it is well established that the public interest favors enforcing valid contracts. *Brown & Brown, Inc. v. Ali*, 494 F.Supp.2d 943, 955 (N.D. Ill. 2007). While the validity of this contract is questioned because of its terms, there is no debate regarding whether this contract was knowingly signed by the plaintiffs. Accordingly, CRC argues that public policy favors the issuance of an injunction. In contrast, Plaintiffs argue that restrictive covenants are disfavored by the courts, and accordingly, enforcing such covenants runs contrary to the public interest. *Jefco Labs., Inc. v. Carroo*, 483 N.E.2d 999, 1001 (Ill. App. Ct. 1985). Each side has significant rights, with contractual enforcement on one side and freedom of employment on the other. I do not find that either side has shown that the public interest weighs in their favor.

The issuance of an injunction would substantially harm the individual Plaintiffs in this matter and the balance of harms weighs against issuing the injunction. Furthermore, while issuing an injunction might go a small way toward soothing the aftermath of plaintiffs' departures, it will repair little of the harm already done. While I acknowledge that a failure to issue this injunction will result in some continued harm to CRC, not only through loss of business, but also in the damaged morale of the remaining employees, this harm is outweighed by the significant harm to the 39 individual plaintiffs who would be enjoined from working for

---

find that CRC has sufficiently shown that confidential information has been taken or is being used by its former employees. RTS has a policy not to use any CRC information and continues to enforce this policy.

RTS and largely preclude any possible employment in their chosen field, the damage to RTS if forced to close its doors, and the harm to CRC's former clients of not being able to choose their broker of choice.

**IV. CONCLUSION**

For the foregoing reasons, CRC's motion for a preliminary injunction is denied.


ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: June 21, 2010